[Crim. No. 6927.   Second Dist., Div. Three.   June 28, 1960.]

THE PEOPLE, Respondent, v. RODRIGO CASTRO, Appellant.

Ellery E. Cuff, Public Defender, John M. Moore and Richard W. Erskine, Deputy Public Defenders, for Appellant.

Stanley Mosk, Attorney General, and S. Clark Moore, Deputy Attorney General, for Respondent.

VALLÉE, J.—By information defendant was charged with murder and a prior conviction of burglary. He pleaded not guilty, denied the prior conviction, and trial was set for October 16, 1956, before Judge Nye. On October 16 Judge Nye declared a doubt of the present sanity of defendant. (Pen. Code, §§ 1367, 1368.) Counsel for defendant demanded a jury trial on the issue. The court appointed two physicians to examine defendant and report to the court. Trial of the issue was set for November 19, 1956. On November 19 the cause was called before Judge Brandler and two more physicians were appointed to examine defendant as to his mental condition and report to the court. Trial of the issue was continued to December 10, 1956. On December 10, before Judge Brandler, trial of the issue by jury was waived, and by stipulation the issue of the present sanity of defendant was submitted to the court on the reports of the four physicians. Judge Brandler found the defendant to be presently insane. Proceedings were suspended and defendant was committed to Atascadero State Hospital until he recovered his sanity.

On June 3, 1957, the sheriff was directed to return defendant to court for further proceedings. On June 19 the cause was called for trial before Judge Odemar. Defendant pleaded not guilty by reason of insanity. Two different physicians were appointed to examine him pursuant to Penal Code, section 1027, and the cause was continued to August 19, 1957. On August 19 Judge Odemar found defendant to be presently insane and committed him to Atascadero State Hospital.

On January 13, 1958, the sheriff was ordered to return defendant to court for further proceedings. On January 30 the cause was called for resetting for trial before Judge Fildew. Two different physicians and one who had previously served were appointed to examine defendant with respect to his present sanity and with respect to his plea of not guilty by reason of insanity with directions to report to the court, and the cause was continued to February 20, 1958. On February 20 Judge Fildew found defendant to be presently insane and committed him to Atascadero State Hospital.

On February 16, 1959, the sheriff was ordered to return defendant to court for further proceedings. On March 2, 1959, the matter was called before Judge Rhone. A minute order was made reading, "It appearing to the Court that there is doubt as to the defendant's present sanity." The court appointed two physicians to examine defendant, and continued the matter to March 23, 1959. On March 23, before Judge

Rhone, the following minute order was made: "It appearing to the Court that the minute order herein of March 2, 1959 by inadvertence does not properly reflect the order of the Court herein, said minute order of March 2, 1959, is corrected nunc pro tunc as of that date, by striking the words 'It appearing to the Court that there is doubt as to the defendant's present sanity.' " Judge Rhone found defendant was able to cooperate with his attorney in the preparation of his defense[1] and continued the matter to March 25.

After several continuances the cause was called for trial on May 12, 1959, before Judge Rhone; a physician was appointed to examine defendant under section 1871 of the Code of Civil Procedure as to his present mental status, and the trial was continued to May 13, 1959. On May 13 the cause went to trial. Two witnesses testified on behalf of defendant on the issue of his present sanity. The court found defendant was presently sane and able to cooperate with counsel in his defense. Defendant then admitted the prior conviction and a jury was impaneled to try the charge of murder. The jury found defendant guilty of voluntary manslaughter. Thereafter trial was had before the same jury to determine the sanity of defendant at the time of the commission of the offense. After about two days' deliberation the jury reported they were unable to agree, a mistrial was declared, and the jury discharged. On July 6, 1959, a new jury was impaneled and the issue of defendant's sanity at the time of the commission of the offense was retried. After two days' deliberation the jury found defendant sane at the time of the commission of the offense. A new trial was denied and defendant was sentenced to state prison.

Defendant appeals from the judgment and the order denying a new trial. The sufficiency of the evidence to sustain the finding of guilt of voluntary manslaughter is not challenged. The assignments of error relate solely to the trial of the issue of sanity at the time the offense was committed. The basic claim is that defendant did not receive a fair trial. ▮▮▮ The first contention is that the district attorney was guilty of prejudicial misconduct. During the closing argument of the district attorney the following occurred: "MRS. LINN [district attorney]: Counsel says he wants to see the defendant found

---

[1]This finding was erroneous. The question before the court was whether defendant was mentally deranged to such an extent as to be incapable of appreciating his situation and making any legal defense that he might have. (*People* v. *Lawson,* 178 Cal. 722, 726 [174 P. 885]; *People* v. *Mallette,* 39 Cal.App.2d 294, 299 [102 P.2d 1084].)

sane [sic] because he thought he should be having some hospitalization. If your verdict comes back legally sane [sic], the defendant is malingering, and just as soon as he regains his sanity, he is released. In effect, he will be snubbing his nose at the Court, the jury and the Police Department. He can get away with the crime because he has been declared legally insane, therefore, not guilty. MR. MOORE [attorney for defendant] : I think your Honor ought to instruct the jury that is not the law, that he has to go to the hospital. THE COURT : Only if the Court is convinced that he has not regained his sanity at the present time. If the Court is convinced he has regained his present sanity, then he is to be released under certain conditions. MR. MOORE : Under what, your Honor? THE COURT : To be released under certain conditions. MR. MOORE : Then there are certain conditions that says he has to go to the hospital. THE COURT : But the jury is not concerned with that. The jury has one concern only, and that is to determine whether he is [sic] sane or insane, and they are not concerned with anything else. It is just the same as the case in chief, they are not concerned with penalty as that is a matter for the Court and other governmental agencies.''

At the conclusion of the argument of the district attorney defendant made a motion for a mistrial, which was denied. Defendant requested additional time to argue what could happen to him if he were found insane. The request was denied. Defendant then requested that the instruction set out in the margin be given.[2] The instruction was refused.

The remarks of the district attorney were patently miscon-

---

[2] ''You shall return a verdict either that the defendant was sane at the time the offense was committed or that he was insane at the time the offense was committed. If the verdict or finding be that the defendant was sane at the time the offense was committed, the court shall sentence the defendant as provided by law. If the verdict or finding be that the defendant was insane at the time the offense was committed, the court unless it shall appear to the court that the defendant has fully recovered his sanity shall direct that the defendant be confined in the state hospital for the criminal insane, or if there be no such state hospital, then that he be confined in some other state hospital for the insane. If, however, it shall appear to the court that the defendant has fully recovered his sanity such defendant shall be remanded to the custody of the sheriff until his sanity shall have been finally determined in the manner prescribed by law. A defendant committed to a state hospital shall not be released from confinement unless and until the court which committed him, or the superior court of the county in which he is confined, shall, after notice and hearing, find and determine that his sanity has been restored. In the event such hearing is held in the county in which the defendant is confined, notice as ordered by the court shall be given to the district attorney of said county and also to the district attorney of the county from which said defendant was committed.''

duct. The argument was that a verdict of not guilty by reason of insanity would in effect free the defendant—he would then be "snubbing his nose at the Court, the jury and the Police Department." A defendant who is found insane on the plea of not guilty by reason of insanity may well be hospitalized for the remainder of his life. (Pen. Code, §§ 1026, 1026a.) The statement was but a partial declaration of Penal Code, section 1026.[3] Combined with the statement was a direct appeal to passion and prejudice. The misconduct of the district attorney called for prompt and vigorous action on the part of the court which it did not receive. Instead, the court compounded the prejudicial nature of the district attorney's misconduct by emphasizing that defendant could be released. The result was that the jury was threatened by the prosecutor, aided by the court, with the idea that by their verdict they would be releasing a killer, and that when released he would be "snubbing" his nose at the jury, the court, and the police department.

As appears, counsel for defendant interjected with the in-

[3]Penal Code, section 1026: "When a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, he shall first be tried as if he had entered such other plea or pleas only, and in such trial he shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed. If the jury shall find the defendant guilty, or if the defendant pleads only not guilty by reason of insanity, then the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury in the discretion of the court. In such trial the jury shall return a verdict either that the defendant was sane at the time the offense was committed or that he was insane at the time the offense was committed. If the verdict or finding be that the defendant was sane at the time the offense was committed, the court shall sentence the defendant as provided by law. If the verdict or finding be that the defendant was insane at the time the offense was committed, the court unless it shall appear to the court that the defendant has fully recovered his sanity shall direct that the defendant be confined in the state hospital for the criminal insane, or if there be no such state hospital, then that he be confined in some other state hospital for the insane. If, however, it shall appear to the court that the defendant has fully recovered his sanity such defendant shall be remanded to the custody of the sheriff until his sanity shall have been finally determined in the manner prescribed by law. A defendant committed to a state hospital shall not be released from confinement unless and until the court which committed him, or the superior court of the county in which he is confined, shall, after notice and hearing, find and determine that his sanity has been restored. In the event such hearing is held in the county in which the defendant is confined, notice as ordered by the court shall be given to the district attorney of said county and also to the district attorney of the county from which said defendant was committed. Nothing in this section contained shall prevent the transfer of such person from one state hospital to any other state hospital by proper authority nor the transfer of such patient to a hospital in another state in the manner provided by law, upon order of the superior court in the county from which he was committed. or in which he is detained."

correct statement that defendant had "to go to the hospital." The court then proceeded to unfairly emphasize the possibility of release. Under these circumstances it was error not to instruct the jury to disregard the remarks of the district attorney and to refuse the requested instruction covering the substance of Penal Code, section 1026, as it relates to the processing of a defendant after a finding that he was insane at the time the offense was committed.

In *People* v. *Mallette*, 39 Cal.App.2d 294 [102 P.2d 1084], this statement of the district attorney in his argument to the jury was condemned (p. 299) : " 'A plea of not guilty by reason of insanity is equally a trial of the case, because if the defendant should be found insane at the time of the commission of the offense that is a finding that she is not guilty of the crime, because *it is a theory of our law that an insane person can not commit a crime, so the crime requires the operation of a sane mind, and therefore she will walk out free if you find she was insane at the time of the commission of the offense.' "
The court commented (p. 299) :

"These remarks were wholly out of place and their effect could not be cured by the subsequent order of the court in striking them. The jury had just convicted her of murder. After said remarks, they could not but have reasoned that if they found her insane they would turn loose upon the community a dangerous person capable of doing much mischief. The statement appealed to a deeply rooted sentiment and could not be erased by any admonition of the court. The instinctive reaction of a socially minded person to the picture of her 'walking out a free woman' is too well understood to require further elucidation. Moreover, after the remarks of the district attorney had left before the jury a vision of the defendant at large in society, the court declined to explain to the jury that a finding of insanity would require defendant to be confined in the state hospital for the criminally insane in accordance with the provisions of section 1026 of the Penal Code. This, he should have done, in view of the remarks of the district attorney."

In *People* v. *Johnson*, 178 Cal.App.2d 360 [3 Cal.Rptr. 28], the district attorney, during the insanity phase of the trial, referring to the defendant in his argument to the jury, stated (pp. 369, 370) : " ' "And, boom! he is found not guilty of a murder in the first degree by reason of this claim, that a 'man threatened me' and nobody can show that there were any threats, so the man walks free and clear of this charge." ' "

Defendant's counsel "immediately objected and the court admonished the jury to disregard all comments relating to the disposition of the case and asked the district attorney not to refer to it again." Speaking for a majority of the court and referring to *People* v. *Mallette, supra,* 39 Cal.App.2d 294, Mr. Justice Draper wrote (p. 356):

"I cannot escape the reasoning of that court that a jury which has just convicted a defendant of murder will be strongly inclined against loosing upon the community one whom they themselves have thus stamped a menace to society. Of course, the argument misstated the law. A defendant found not guilty by reason of insanity is to be confined in a state hospital for the criminally insane unless and until he is determined to have fully recovered his sanity. (Pen. Code, § 1026.)

"Under these circumstances, the admonition of the trial court was inadequate to remove the prejudice. The jury was told that 'what would happen under the condition' outlined by the prosecutor 'is no concern of yours,' and that the jurors 'must absolutely erase any reference to any disposition from your minds.' The inaccuracy of the prosecutor's statement of the legal consequences of a verdict for defendant lends weight to the statement in *Mallette* that an effective cure could be given only by an instruction upon the true effect of such a verdict. No such instruction was given here. . . .

" [P. 357.] In view of the highly conflicting evidence as to defendant's sanity, the prosecutor's misconduct appears to me to be prejudicial, and thus beyond the healing powers of section 4½ of article VI of the Constitution."

The judgment was reversed as to the plea of not guilty by reason of insanity.

█ In rebuttal the People called one E. L. Smith, who qualified as an expert on fingerprints. Over objection he identified a fingerprint card on which defendant's fingerprints had been placed, compared the fingerprints on the card with those on a certified copy of a document which contained a photograph of defendant, his fingerprint card, and a judgment of a Montana court dated March 4, 1955, showing he had been found guilty in that state of burglary of the first degree and sentenced to state prison. The evidence was ostensibly offered for two purposes: (1) as a foundation for rebuttal testimony of Dr. Crahan with respect to the likelihood of defendant's being insane at the time of the commission of the offense, and (2) as showing defendant was sane on the date of the judgment. The court stated the evidence was received for the pur-

pose of showing that judgment was pronounced against defendant, since Montana law provides that a person cannot be tried or convicted or sentenced while insane, and also for the purpose of rebutting testimony that defendant had been mentally ill for "a good" many years. The document referred to was admitted in evidence over objection. The objection to the testimony of Mr. Smith and to the reception in evidence of the certified document was on the grounds that the offered evidence was irrelevant; that it was not really rebuttal but merely an attempt to prejudice defendant by putting on proof of the prior conviction and the documents connected therewith as the last evidence to come before the jury; and that the prosecution had called a witness who testified on cross-examination that the mental illness had extended over many years.

Immediately following the reception in evidence of the certified document, Dr. Crahan was recalled in rebuttal and asked what effect the prior conviction would have on his opinion previously testified to that defendant was legally sane at the time of the commission of the offense. He answered it would not change his opinion nor would it affect it. Both sides then rested.

The evidence was improper rebuttal. There had been no evidence that defendant was legally insane in March 1955. The only evidence which had been introduced relating to defendant's mental condition prior to August 3, 1956, the date the homicide was committed, was testimony that his mental illness was one of long standing. There was no showing that the issue of insanity was raised in the Montana action. The prosecution, in its case in chief on the insanity issue, specifically asked its witness, Dr. Crahan, whether in forming his opinion that defendant was sane at the time the offense was committed he had considered that defendant had been in state prison in Montana and had been released a short time before he came to Los Angeles. He had answered that he had done so. The prior conviction was charged in the information. If proof of it was proper at all, the time was in the People's case in chief. Instead, the district attorney waited until the evidence was about to close to introduce defendant's photograph, his fingerprints, and the official record of the prior conviction, and to have Dr. Crahan again testify to what he had already testified in chief: that he had considered the fact. It is obvious the evidence was deliberately withheld until rebuttal. The People offer no reason why the evidence could not have been introduced in chief. It was error to admit this evidence in rebuttal.

The People were permitted to prejudice the jury against defendant by a devastating maneuver: the erroneous admission of highly prejudicial material as the last evidence the jury heard. They were permitted to dramatically magnify defendant's prior conviction as the closing evidence. The desire to gain an advantage by using the evidence in rebuttal is not open to debate.

It is the rule that an abuse of discretion may well result from allowing a district attorney, by way of rebuttal, to introduce evidence which should have been in the People's case in chief. (*People* v. *Washington*, 163 Cal.App.2d 833, 842 [330 P.2d 67].) The procedure adopted by the district attorney and permitted by the court has become altogether too prevalent. It is unfair and cannot be condoned. It has been condemned by the Supreme Court and repeatedly by this court. In *People* v. *Carter*, 48 Cal.2d 737 [312 P.2d 665], the Supreme Court stated (p. 753):

''On rebuttal the prosecution was allowed to introduce in evidence the red cap found in Edgar Slough. Defendant contends that by withholding this important evidence instead of presenting it as part of its case in chief, the prosecution gained an unfair advantage over defendant. The prosecution contends in reply that since defendant denied on the stand that he had been to Edgar Slough or left the wallet or wrench there, the cap was properly admitted to rebut this testimony or impeach defendant's credibility.

''Section 1093, subdivision 4, of the Penal Code provides that after the defendant has offered his evidence, the prosecution may then offer 'rebutting testimony only, unless the court, for good reason, in furtherance of justice . . .' permits it to offer evidence upon its original case. In a sense all evidence that tends to establish the defendant's guilt over his protestations of innocence rebuts the defendant's case, but it is not all rebuttal evidence within the purpose of section 1093, subdivision 4. The purpose of the restriction in that section is to assure an orderly presentation of evidence so that the trier of fact will not be confused; *to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial*; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of trial with an additional piece of crucial evidence. Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission

of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt. [Citations.] ██ A defendant's reiterated denial of guilt and the principal facts that purportedly establish it does not justify the prosecution's introduction of new evidence to establish that which defendant would clearly have denied from the start.

"The red cap found in Edgar Slough was crucial evidence tending to show that defendant had put the wallet and wrench in the slough and therefore had beaten and robbed Carey. Defendant's plea made it clear that he would not admit having gone to the slough, and his denial on the stand furnished no new matter for rebuttal. The evidence should have been put in as part of the case in chief. (See *People* v. *Rodriguez,* 58 Cal.App.2d 415, 418-419 [136 P.2d 626].)

██ "Changes in the order of proof called for by section 1093 can be made within the sound discretion of the trial court. (*Cf. People* v. *Avery,* 35 Cal.2d 487, 491 [218 P.2d 527].) In the present case, however, the prosecution offers no reason why the cap could not have been introduced in chief, but since defendant did not make completely clear to the trial court the objection that he now argues, we would not be justified in finding that there has been an abuse of discretion. On the retrial of this case an order of proof will no doubt be observed that is consonant with the purposes of section 1093." (Emphasis added.)

*People* v. *Wein,* 50 Cal.2d 383 [326 P.2d 457], says (p. 407): "The practice of allowing the district attorney or his aides to withhold a part of their case in chief and to offer it after the defense has closed has been condemned in *People* v. *Carter,* 48 Cal.2d 737, 753-754 [312 P.2d 665], and *People* v. *Rodriguez,* 58 Cal.App.2d 415, 418-419 [136 P.2d 626]."

In the recent case of *People* v. *Robinson,* 179 Cal.App.2d 624 [4 Cal.Rptr. 50], this court stated (pp. 629, 630): "During the foregoing cross-examination of defendant, his counsel, anticipating that it was the purpose of the People to offer evidence that defendant had made the statements to the officers which he had just denied having made, interposed an objection to such evidence about to be offered in rebuttal upon the ground that any evidence of defendant's incriminating statement was a part of the People's case in chief and, therefore, not admissible on rebuttal. The objection was overruled. It should have been sustained.

"It was, of course, wholly unnecessary to question defendant on cross-examination with respect to any statement or admissions he may have made. The rules with respect to laying a foundation for impeachment by proof of inconsistent or contrary statements have no pertinency to proof of statements or admissions of a party. 'The act, declaration, or omission of a party, as evidence against such party' may be proved upon a trial. (Code Civ. Proc., § 1870, subd. 2.) The statements attributed to defendant by the rebuttal testimony were a part of the People's evidence in chief, and not proper rebuttal. The only proper method to have them placed in evidence would have been for the People to move for leave to reopen their case in chief. Defendant would have had a right to oppose the motion and it would have been necessary for the People to show good cause for granting the motion. Defendant could well have contended that he was taken by surprise. He had been furnished with a statement of the testimony the officers would give. It contained nothing except what was in the police report, which was also furnished him. There was no suggestion therein of the very damaging statements that were testified to on rebuttal. The court could well have denied a motion to reopen the People's case.

"The device of bringing in the evidence as rebuttal upon the theory that it was proper by way of impeachment was merely a means of evading the proper and necessary step of seeking leave to reopen the case in chief. . . ."

" [P. 638.] We return to the first point previously mentioned, namely, the error in the admission of the rebuttal testimony. As we have stated, that testimony would have been properly received only if the court had granted a motion by the People to reopen their case. There was no such motion. There was no showing by the People which would have warranted reopening the People's case, after the defense had rested. Defendant had no occasion to resist the motion because none was made. During the questioning of Kalas counsel renewed his previous objection that the rebuttal testimony was inadmissible, and it was again overruled. Had the court excluded the rebuttal testimony of Kalas it would have left out of the case evidence of the statements of defendant which, being before the jurors, could have been deemed by them the most discreditable of all. As we have said, it was error to overrule the objections of defendant." (Also see *People* v. *Todd*, 175 Cal.App.2d 508 [346 P.2d 529].)

The offense for which defendant was convicted was committed on August 3, 1956. On October 16, 1956, Judge Nye expressed a doubt as to the present sanity of defendant. Three judges found defendant to be presently insane: Judge Brandler in December 1956, Judge Odemar in August 1957, and Judge Fildew in February 1958. Between his arraignment on September 4, 1956 and March 23, 1959, the date Judge Rhone found him to be "able to cooperate with his attorney in the preparation of his defense," defendant spent approximately 30 months in Atascadero State Hospital. The first jury which convicted him of voluntary manslaughter was unable to agree on the question of his sanity at the time of the commission of the offense. On the trial which resulted in the judgment from which this appeal is taken, six psychiatrists testified that in their opinions defendant was legally insane at the time of the commission of the offense; and three testified that in their opinions he was legally sane at that time. Of the three, one testified that on October 2, 1956, he had been of the opinion defendant was mentally ill; one testified that in February 1958 he was of the opinion defendant was suffering "from some degree of mental disorder," and that on March 6, 1959, defendant was mentally ill, the illness specified as delusional or paranoid schizophrenia, and that this illness had been of long standing; and the other testified that in November 1956 he was of the opinion defendant was legally insane. Of the six psychiatrists who testified defendant was legally insane at the time the offense was committed, one was Dr. Thomas Gore, who was Assistant Superintendent of Atascadero State Hospital in 1956 and 1957 at the times defendant was confined there, and another was Dr. Henry Neufold, who from October 1, 1956, to the trial was in charge "of the receiving ward for the criminally insane, and the maximum security risk among the mentally ill patients" at Atascadero State Hospital, and who in addition to his routine duties in relation to defendant had spent many hours talking to him in private. Four of the psychiatrists who testified that in their opinions defendant was insane at the time the offense was committed were men who had previously been appointed by the court to examine defendant as to his sanity at such time or as to his present sanity. It clearly appears that the question of the sanity of defendant at the time of the commission of the offense was a close one. Defendant's burden was to prove his insanity at such time by a preponderance of evidence, not beyond a

reasonable doubt. (*People* v. *Baker*, 42 Cal.2d 550, 564 [268 P.2d 705].) The evidence clearly would have supported a finding that defendant was insane at the time the offense was committed. On this record we are of the opinion it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the prejudicial errors we have noted.

Defendant asserts that in its rulings and remarks relating to Dr. Neufold, the court exhibited a partisan attitude that was obvious to the jury and prejudicial. While some of these assertions appear meritorious, the criticized rulings and remarks are not likely to occur on a retrial and need not be discussed.

The judgment and order denying a new trial on the plea of not guilty are affirmed. As to the plea of not guilty by reason of insanity, the judgment and order denying a new trial are reversed for a new trial of the issues raised by that plea.

Shinn, P. J., and Ford, J., concurred.